### In re M. L. B. STURKEY CO., Inc.

### In re CHASE CITY MFG. CO.

#### (District Court, W. D. South Carolina. July 6, 1915.)

1. BANKRUPTCY ⟐140—PROPERTY VESTING IN TRUSTEE—CONDITIONAL SALES—CONSIGNMENT.

An unrecorded contract, stating that the first parties had consigned a car of wagons to the second parties "to be paid for as follows: * * * All goods sold during the month be paid for the first day of the succeeding month," the second parties to store and insure the wagons, and in case of their destruction or injury by fire to pay for them at cost—and which made no provision reserving title, or for the return of the unsold wagons, is a contract of sale, not consignment, the word "consigned" being used in the sense of "delivered," and the trustee in bankruptcy of the second party is entitled to the wagons.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⟐140.]

2. BANKRUPTCY ⟐184—PROPERTY VESTED IN TRUSTEE—VOID LIEN.

Even if that contract were construed to be a consignment, not a sale, it made the consignee a bailee, and was void against the trustee in bankruptcy, under Civ. Code S. C. 1912, § 3740, providing that agreements by which the vendor or bailor reserves any interest in the property shall be void as to subsequent creditors, unless they are in writing and recorded.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. ⟐184.]

In Bankruptcy. Proceedings against the M. L. B. Sturkey Company, Incorporated. On exceptions to the report of the referee disallowing the claim of the Chase City Manufacturing Company to certain property in the hands of the trustee. Referee's report approved and affirmed.

J. Moore Mars, of Abbeville, S. C., for trustee.
Featherstone & McGhee, of Greenwood, S. C., for claimant.

JOHNSON, District Judge. This case came on to be heard before me, at the request and by consent of counsel, on exceptions to the report of the referee. On May 1, 1914, M. L. B. Sturkey Company, a mercantile corporation, entered into a contract with the Chase City Manufacturing Company for the purchase of a car load of wag-

ons, to be shipped October 1 to November 1, 1914. It is provided in the said contract, among other things, as follows:

"It is expressly understood and agreed that all goods on hand and proceeds of all sales of goods received under this contract, also of all goods hereafter shipped to the maker of this contract, whether the proceeds are in notes, cash, or book accounts, are to be held as collateral security in trust and for the benefit of and subject to the order of the Chase City Manufacturing Company, until full cash settlement has been made of all obligations due to the said Chase City Manufacturing Company; that the title and ownership of all goods shipped under this contract shall remain vested in the Chase City Manufacturing Company until the price thereof shall have been paid in cash, or until all notes given under this contract are paid; but nothing in this clause shall be considered a release from making payments as provided elsewhere in this contract. If said goods, or any part thereof, be lost, damaged, or destroyed, before payment in full therefor by us, there shall be no rescission of the contract nor abatement in the price, but same shall be our loss, and not that of the Chase City Manufacturing Company.

"It is further understood and agreed that notes taken by the Chase City Manufacturing Company in settlement are not accepted as payment, but only as evidence of indebtedness. We further agree that a receipt from transportation company for goods delivered in good order shall be a release to the Chase City Manufacturing Company, and agree to look to the transportation company for all losses occasioned by rubbing, chafing, or any damage which may occur to goods while in transit, or the nondelivery of any goods receipted for.

"It is further agreed that in case of death or financial embarrassment of the firm, or any member or individual making this contract, all accounts or notes for goods bought under this contract shall become immediately due and payable. Right of homestead and exemption expressly waived. Accepted subject to the approval of the Chase City Manufacturing Company."

The wagons were shipped about October 1st. When the invoice reached Sturkey Company, Sturkey Company wrote as follows:

"McCormick, S. C., Oct. 1, 1914.

"The Chase City Mfg. Co., Chase City, Va.—Gentlemen: Your invoice of wagons received, and we wired you immediately: 'Have wagons returned to you. We cannot use under present conditions. See letter.' We did not expect the shipment to be made before November, as the duplicate stated same to be made October to November, and under the present disastrous situation you surely should have conferred with us before shipping. It is out of the question for us to handle the car now, as the situation in this section is desperate both as to collections and cash sales. Trusting our telegram reached you before the car left your city, and that you have had same returned to you.

"Yours truly,                                     M. L. B. Sturkey Company."

On October 5th the Sturkey Company wired as follows:

"Chase City Mfg. Co., Chase City, Va.:

"Your ignoring of instructions as well as disregard of distressed conditions in cotton section justify our refusal of wagons except on consignment contract. Wire your acceptance of such terms and will proceed to unload car. For less than ten cents for cotton there will be no wagon business for some time.

"M. L. B. Sturkey Company."

And the Chase City Manufacturing Company answered on October 6th as follows:

"M. L. B. Sturkey Company, McCormick, S. C.:

"Unload wagons, consignment contract will follow in mail.

"Chase City Wagon Mfg. Co."

Following the foregoing letter and telegrams the second contract was entered into, to wit:

"This contract, made this 6th day of October, in the year 1914, by and between the Chase City Manufacturing Company, of Chase City, Mecklenburg county, Virginia, parties of the first part, and M. L. B. Sturkey Company, of McCormick, S. C., parties of the second part: Parties of the first part have this day consigned a car of wagons to parties of the second part to be paid for as follows: Prices named in order for goods to stand, and all goods sold during the month to be paid for the 1st day of the succeeding month at $24.25 and $25.25 for the one-horse wagons and $40.00 and $41.00 for the two-horse wagons. Parties of the second part to store and keep insured the wagons, and should a fire occur, and burn or injure them, then parties of the second part agree to settle at once for them. Parties of the first part are privileged to check up the wagons at any time they may see fit to do so.

"Witness our hands and seals this the 6th day of October, 1914.

"Chase City Mfg. Co., [Seal.]

"By Lucious Gregory, President,

"M. L. B. Sturkey Co., [Seal.]

"By M. L. B. Sturkey, President."

Neither contract was recorded. In January, 1915, the M. L. B. Sturkey Company was adjudged bankrupt, and thereafter a trustee was elected, who took charge of the property of the bankrupt, including the wagons here in controversy. The Chase City Manufacturing Company filed its petition, alleging that it had title to and was the owner of the wagons and entitled to their possession. The referee heard the case and filed his report, in which he held that the wagons passed to the trustee in bankruptcy for the benefit of the creditors of the bankrupt. There were subsequent creditors in this case, but the referee does not refer to that fact in his report. The Court of Appeals, in Millikin v. Bank, 30 Am. Bankr. Rep. 477, 206 Fed. 14, 124 C. C. A. 148, in construing and giving effect to the amendment of 1910 as to the rights of the trustee, holds that the trustee occupies the position of a lien creditor for the benefit of all creditors of the bankrupt. This cuts out, root and branch, all secret liens, as the law intended.

It is conceded by counsel for the petitioner that under the original contract, unrecorded, the title to the wagons would pass to the trustee; but it is earnestly and ably insisted that the substituted contract of October 6, 1914, merely created the M. L. B. Sturkey Company agent of the Chase City Manufacturing Company, and that the title to the wagons never passed and was never intended to pass to the M. L. B. Sturkey Company. Being strongly impressed with the equities of the petitioner, I have examined this case very carefully. It seems to me that the material difference between the substituted contract of October 6, 1914, and the original contract, is in the terms of payment. The original contract fixed definite periods of 60, 90, and 120 days, while the substituted contract provided that the wagons sold during any one month should be paid for on the 1st day of the following month. It is true that the contract of October 6th states that the "parties of the first part have this day consigned a car of wagons to the parties of the second part"; but in the same sentence it is stated that the wagons are "to be paid for as follows." The word "consigned," as used in this contract, seems to be used in the sense of "delivered." There is no reservation of title in the Chase City Manufacturing Com-

pany, nor any agreement for the return of the unsold portion of the goods, nor any other word, phrase, or sentence that would ordinarily be used in drawing a contract of consignment. It seems to me to be a sale.

[2] But, even if it could be held that it was a contract of consignment, nevertheless the relation of bailor and bailee existed between the petitioner and the bankrupt. Section 3740 of the Code of Laws of South Carolina (1912), vol. 1, provides as follows:

"Every agreement between the vendor and vendee, bailor or bailee of personal property, whereby the vendor or bailor shall reserve to himself any interest in the same, shall be null and void as to subsequent creditors (whether lien creditors or simple contract creditors) or purchasers for valuable consideration without notice, unless the same be reduced to writing and recorded in the manner now provided by law for the recording of mortgages; but nothing herein contained shall apply to livery stable keepers, inn keepers, or any other persons letting or hiring property for temporary use or for agricultural purposes, or depositing such property for the purpose of repairs or work or labor done thereon, or as a pledge or collateral to a loan."

With the exceptions named in the statute, contracts of bailment must be reduced to writing and recorded like mortgages. This case does not fall within any of the exceptions named in the statute. "The inclusion of the one is the exclusion of the other." The failure to record the contract was fatal to the petitioner. Augusta Grocery Co. v. Moline Plow Co., 31 Am. Bankr. Rep. 677, 213 Fed. 786, 130 C. C. A. 444; Townsend, Leaphart, etc., v. Ashepoo Co., 31 Am. Bankr. Rep. 682, 212 Fed. 97, 128 C. C. A. 613.

The report of the referee is approved and affirmed.